UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SHERRY KLOSS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:06-cv-0833-DFH-JMS |
| | ) | |
| BALL STATE UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |


ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT


Plaintiff Sherry Kloss has sued her former employer, defendant Ball State
University ("BSU"), for age discrimination in violation of the Age Discrimination in
Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, and religious and sex
discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended,
42 U.S.C. § 2000e, *et seq.*  Defendant has moved for summary judgment on all
claims.  As explained below, defendant's motion is granted as to all claims.


*Summary Judgment Standard*


The purpose of summary judgment is to "pierce the pleadings and to assess
the proof in order to see whether there is a genuine need for trial."  *Matsushita*
*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary
judgment is appropriate when there are no genuine issues of material fact, leaving

the moving party entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).
The moving party must show that there is no genuine issue of material fact.
*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

A factual issue is material if resolving the issue might change the suit's
outcome under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,
248 (1986).  A factual issue is genuine if there is sufficient evidence for a
reasonable jury to return a verdict in favor of the non-moving party on the
evidence presented.  *Id.*  In deciding a motion for summary judgment, a court may
not assess the credibility of witnesses, choose between competing inferences, or
balance the relative weight of conflicting evidence; the court must view all the
evidence in the record in the light reasonably most favorable to the non-moving
party and resolve all factual disputes in favor of the non-moving party.  See Fed.
R. Civ. P. 56(c); *Anderson*, 477 U.S. at 255; *Celotex*, 477 U.S. at 323.

*Facts for the Purpose of Summary Judgment*

The following facts are not necessarily true.  They are either undisputed or
reflect the evidence in the light most favorable to plaintiff Kloss as the party
opposing summary judgment.  Facts established by defendant BSU beyond
reasonable dispute are necessarily included in the narrative.

Plaintiff Kloss is a violinist who trained at The Juilliard School, Boston University, in Europe and, for many years, with the renowned Jascha Heifetz. She worked as a visiting professor at the Adelaide College of Arts and Education and then as a teaching associate for Heifetz at the University of Southern California. Kloss Dep. at 8-9. BSU appointed Kloss as the Sursa Distinguished Professor of Violin in 2000. Kloss Aff. ¶ 2.

Kloss was on a seven year tenure track. During that time, she received annual written assessments of her work and progress toward tenure by the School of Music's Promotion and Tenure Committee ("School Committee") and her department chairperson. See Def. Ex. 11, §§ 2.10, 2.19 ("University Promotion and Tenure Document"). Under BSU policy, the School Committee and the department chairperson evaluate whether a tenure-track professor is making satisfactory or unsatisfactory progress toward tenure, and provide detailed suggestions for areas of improvement. Both written reports are sent to the academic dean and the provost. The School Committee and the department chairperson evaluate each tenure-track professor based on teaching, research, publication, creative endeavors or other scholarly productivity, and service in a professional capacity. *Id.*, §§ 1.11, 2.19.

During her first and second years at BSU, Kloss received favorable reviews from both the School Committee and her department chairperson. Def. Exs. F & G. In her third year review, the School Committee gave Kloss a recommendation

of satisfactory progress toward tenure, with reference made to strong peer and student evaluations and an extensive list of performances.   Def. Ex. H at 2. However, in that third year review, both the School Committee and the chairman noted several areas of concern with respect to Kloss' performance.   The School Committee stated that it expected her to "recruit more high caliber students and to document the area of recruitment for future reviews"; to "seek additional juried/reviewed performances at regional, national, and international venues and conferences"; and to "obtain service opportunities at the school, college, and university levels."   *Id.* at 2-3.   Similarly, department chairman Peter McAllister encouraged Kloss to increase the quality and quantity of students, to schedule additional performances, and to participate in professional and school activities. *Id.* at 4-5.

During her fourth year, the School Committee and chairman McAllister both gave Kloss unsatisfactory recommendations.   Def. Ex. I.   The School Committee noted lack of organization of her curriculum vita and supporting materials.   *Id.* at 2.   The School Committee acknowledged some recruiting efforts by Kloss, but it concluded that she was neither recruiting a sufficient number of new performance students nor demonstrating successful placements of graduating students in performance-related fields.   *Id.* at 3-4.   The Committee stated its expectation that Kloss increase the number of her performances as a member of the American Piano Trio and as an individual.   *Id.* at 4-5.   The Committee again pointed to Kloss' lack of participation in faculty committees.   *Id.* at 5.

That same year, chairman McAllister noted disappointing numbers of violin students and few career placements in performance-related fields. *Id.* at 7. He stated:

> A consistent high-level standard of excellence and attainment of accomplishments at the regional and national level, both in quality of performance and ranking of venue/performance series, is a necessary requirement for tenure at BSU. Ms. Kloss is strongly cautioned that this area is not a consistent area of strength for her. For a faculty member in violin performance at our School of Music, it must be made to be an outstanding area of continued excellence in order to be granted tenure at BSU. . .

*Id.* at 8. He again encouraged Kloss to take part in service opportunities within her specific field, the school, and the larger university. *Id.*

Kloss asked the School Committee to reconsider its recommendation. In response, the School Committee issued an additional memorandum reiterating its recommendation of unsatisfactory progress toward tenure. Def. Ex. I at 9-11. The School Committee stated that Kloss had presented insufficient evidence of student success, recruitment efforts, competitive performances, and publications to satisfy the requirements for satisfactory progress toward tenure. *Id.* The College of Fine Arts Promotion and Tenure Committee ("College Committee") reviewed Kloss' application materials independently and concluded that "there are distinct problems with regard to teaching, scholarship, and service and that she is not making satisfactory progress toward tenure in her fourth year." *Id.* at 12.

In November 2004, during her fifth and, as things turned out, final year at BSU, the School Committee again recommended unsatisfactory progress toward tenure for Kloss and advised her of its recommendation that the university terminate her employment at the end of the following academic year (Spring 2006). Def. Ex. K at 1. The School Committee cited a lack of violin performance majors and a lack of significant student accomplishments related to violin playing. *Id.* at 3. The School Committee provided examples of significant student accomplishments that would demonstrate success by a full professor, including students winning national or regional competitions and students performing solo recitals or concertos off-campus. *Id.* The School Committee also found that Kloss failed to meet its expectations of sufficient participation in major recitals receiving critical notice or performances in major venues. *Id.* at 4. Finally, the School Committee found that Kloss had not demonstrated sufficient service to the school or her profession during the previous year. *Id.* at 5. Chairman McAllister agreed with the School Committee's recommendations. *Id.* at 6-8.

Kloss requested reconsideration of the School Committee's decision, alleging discriminatory and unfair treatment on the part of the decision-makers. Def. Ex. L at 1. The Committee reviewed the documents Kloss submitted for clarification, along with the documents she had originally submitted, and affirmed its decision to recommend unsatisfactory progress toward tenure and to recommend eventual termination rather than tenure. *Id.* at 4. The School Committee concluded that

Kloss' allegations of discriminatory treatment did not pertain to the work of the Committee or any of its individual members.  *Id.*

Kloss next appealed the School Committee's recommendation to the College Committee.   On March 14, 2005, after hearing statements from Kloss, a representative from the School Committee, and Chairman McAllister, the College Committee voted against upholding Kloss' allegations of unfair treatment and discrimination and supported the School Committee's recommendation of unsatisfactory progress toward tenure.  Def. Ex. P at 1-2.  On May 1, 2005, the University Promotion and Tenure Committee determined that the School Committee had not unfairly applied to Kloss a standard or evaluation process different from those applied to other professors and had not discriminated against her.  Def. Ex. R at 10-11.

Kloss then met with Interim Provost and Vice President for Academic Affairs Deborah Balogh to discuss her treatment during the tenure review process.  After reviewing the relevant materials and speaking with the chairman of the University Committee and Dean Kvam of the College of Fine Arts, Balogh concluded:  "The decision regarding tenure was made in the appropriate manner and was based upon a fair review of your performance."  Def. Ex. S.

On July 15, 2005, BSU President Jo Ann Gora informed Kloss that her employment would be terminated at the end of the coming 2005-06 academic

year.  Def. Ex. T.  Instead, however, Kloss submitted a letter on July 31, 2005 resigning effective August 19, 2005.  Def. Ex. U.

During her time at BSU, several of Kloss' colleagues made comments or engaged in acts that Kloss found offensive and discriminatory.  (These matters may be disputed, but BSU's decision to seek summary judgment requires the court to give Kloss the benefit of conflicts in the evidence on these points.)  Dean Kvam stated at the opening faculty meeting of 2004 that receiving money from the Sursa family would enable the School of Music to "hire and attract young faculty."  Kloss Dep. at 121.  During a rehearsal with Kloss, Professor Tetel once stated "I like older women."  *Id.* at 134.

Anti-Semitic graffiti was found on a BSU building in 2001.  *Id.* at 40.  BSU scheduled the grand opening of the Sursa Music Concert Hall for Yom Kippur, the holiest day of the Jewish calendar, making it impossible for Kloss to attend or perform at that event.  *Id.* at 122.  Professor Levin introduced himself to Kloss and immediately stated that he was Protestant.  *Id.* at 35.  In his first conversation with Kloss, Chairman McAllister made a point of telling her that he and his wife had attended Passover seders at a neighbor's house.  *Id.* at 36-37.  Professor Sturm told two rabbi jokes, once using a fake Yiddish accent.  *Id.* at 68, 134-35.  Professor Tetel twice made comments about the presence of pork in the cafeteria, despite it being well known that Kloss kept kosher.  *Id.* at 130-32.

Kloss has also testified that Robert Palmer, a piano professor and a member of the American Piano Trio, often put his arm around her waist and said "Hi, beautiful" when he saw her in the school hallways.  Kloss Dep. at 46.  Kloss has also testified that Palmer once placed his hand on her leg, *id.*, and on another occasion attempted to kiss her on the mouth, *id.* at 100.

Kloss never filed a complaint within BSU based on discrimination or sexual harassment.  Kloss Dep. at 21.  On July 12, 2005, Kloss filed a charge of discrimination with the Equal Employment Opportunity Commission stating that she had been harassed and expected to be terminated based on her age (59), sex (female), and religion (Jewish).  Def. Ex. V at 2.  Additional facts are noted as needed, keeping in mind the standard applicable on summary judgment.

*Discussion*

I.    *Age Discrimination Claim*

The Age Discrimination in Employment Act defines an "employer" to include states.   See 29 U.S.C. § 626(b) (incorporating enforcement mechanisms and definitions from Fair Labor Standards Act, 29 U.S.C. §§ 203(d) & (x) & 216(b)).   In *Kimel v. Florida Board of Regents*, 528 U.S. 62 (2000), however, the Supreme Court held that the Eleventh Amendment bars ADEA claims for monetary damages against non-consenting states.   Defendant BSU is a state institution that serves as "an instrumentality of the State of Indiana for the purpose of the Eleventh Amendment. . . ."   *Riggin v. Board of Trustees of Ball State University*, 489 N.E.2d 616, 632 (Ind. App. 1986); see also *Kashani v. Purdue University*, 813 F.2d 843, 845 (7th Cir. 1987) (holding that Purdue University was an instrumentality of the State of Indiana and stating:  "it would be an unusual state university that would not receive immunity").   The Eleventh Amendment bars Kloss' monetary claims against BSU based on the ADEA.

The Eleventh Amendment does not prevent private citizens from seeking injunctive relief from state officials.   See generally *Ex parte Young*, 209 U.S. 123 (1908).   To meet the requirements of the *Ex parte Young* doctrine, the plaintiff must name a state official in his or her official capacity as a defendant.   *Ameritech Corp. v. McCann*, 297 F.3d 582, 586 (7th Cir. 2002).   Here, Kloss seeks injunctive relief in the form of reinstatement to her position at BSU but has sued only the

university, not a state or university official in his or her official capacity.  Claims by Kloss for injunctive relief based on the ADEA are also barred by the Eleventh Amendment.[1]

II.    *Religious and Sex Discrimination Claims*

To prove unlawful sex or religious discrimination, a plaintiff has two principal options.  First, she may offer direct evidence that her employer took an adverse employment action against her because of her sex or religion.  See *Gore v. Indiana University*, 416 F.3d 590, 592 (7th Cir. 2005) (sex discrimination); *Venters v. City of Delphi*, 123 F.3d 956, 972-73 (7th Cir. 1997) (religious discrimination).  Alternatively, a plaintiff may utilize the indirect burden-shifting approach drawn from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this approach, the plaintiff must first come forward with a *prima facie* case, requiring evidence that:  (1) she is a member of a protected class; (2) she was meeting her employer's legitimate expectations; (3) she was the subject of an adverse employment action; and (4) the employer treated similarly situated employees who were not in the protected class more favorably.  *Lim v. Trustees of Indiana University*, 297 F.3d 575, 580-581 (7th Cir. 2002) (applying *McDonnell Douglas* approach to sex discrimination claim); *Marchioni v. Board of Education of City of Chicago*, 341 F. Supp. 2d 1036, 1046-47 (N.D. Ill. 2004) (applying

---

[1]In addition, for reasons parallel to those explained below concerning claims of sex and religious discrimination, Kloss has not come forward with evidence of age discrimination that would survive summary judgment on the merits of her ADEA claim.

*McDonnell Douglas* approach to sex and religious discrimination claims). If she can come forward with evidence to support this *prima facie* case, the burden then shifts to the employer to provide a legitimate, non-discriminatory reason for its employment decision. The burden then shifts back to the employee to come forward with evidence that the employer's explanation is a false pretext, in which case the trier of fact may infer intentional discrimination. *Robin v. Espo Engineering Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000).

A.    *Prima Facie Case*

Kloss has presented evidence only under the *McDonnell Douglas* burden-shifting approach. It is undisputed that Kloss meets the first and third prongs of the test because she is a Jewish female and BSU denied her tenure. Kloss argues that she was meeting BSU's legitimate expectations and that BSU treated non-Jewish males more favorably than it treated her.

1.    *Employer's Legitimate Expectations*

When determining whether an employee was meeting the legitimate expectations of an employer, the question is simply whether the employee was meeting the *bona fide* expectations that the employer actually had, not whether the employer's expectations were overly demanding. *Robin,* 200 F.3d at 1090*; Coco v. Elmwood Care, Inc.,* 128 F.3d 1177, 1179 (7th Cir. 1997) ("it is no business

of a court in a discrimination case to decide whether an employer demands "too much" of his workers . . .").

The University Promotion and Tenure Document states that the evaluation of a BSU faculty member for the purpose of tenure is based on "evidence of a continuing pattern of achievement throughout the faculty member's professional career in the following areas: Teaching; Research, publication, creative endeavors, or other scholarly productivity; Service in a professional capacity." Pl. Ex. 5, § 1. The College of Fine Arts Guidelines for Promotion and Tenure include these same criteria for evaluation.  Def. Ex. 12, § 1.

Kloss claims that the School Committee erred in concluding that she was deficient in her recruitment efforts, service at the university and in the profession, and the quality and quantity of her performances.  She has presented evidence about the number of students she recruited and the number of her performances. Pl. Exs. 10-12.  She also asserts that after she unsuccessfully tried to serve on a university or school committee, she performed other services for the school.  These services included mentoring students, working with the campus Hillel organization, and raising money for an endowment.  Kloss Dep. at 49-52, 88-90. Assuming, as the court must at the summary judgment stage, that the facts are as she presents them, the court will also assume that Kloss has raised an issue of material fact as to whether she was meeting BSU's legitimate expectations.

2.     *Treatment of Similarly Situated Employees*

Kloss must also present evidence from which a reasonable jury could conclude that BSU treated similarly situated employees who were not Jewish and/or female more favorably than it treated her.  See *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 791 (7th Cir. 2007).  To demonstrate that another individual is similarly situated to the plaintiff, the plaintiff must show that the individual is "directly comparable to the plaintiff in all material respects." *Thanongsinh v. Board of Education*, 462 F.3d 762, 774 (7th Cir. 2006), quoting *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).  In determining whether two individuals are sufficiently comparable, the court considers factors such as whether the employees had the same job description, were subject to the same standards, and had comparable experience and other qualifications.  *Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 680 (7th Cir. 2002).  The inquiry about similarly situated employees is "not an unyielding, inflexible requirement that requires near one-to-one mapping between employees. . ." *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007).  Instead, the court must make a "common-sense" factual determination as to whether there are enough commonalities between the individuals to make a meaningful comparison.  *Id.*

Kloss claims that during the period of 2000 to 2006, two of the five individuals to whom the School of Music denied tenure were Jewish.  Kloss Aff.

¶ 25.   During this time period, she asserts, the only two people to whom the School of Music granted tenure were non-Jewish males.  *Id.* at ¶ 24.  This is the only evidence that Kloss has presented in support of her claim that BSU treated similarly situated males and/or non-Jews more favorably than it treated her.  She has not provided any information to demonstrate that the other faculty members who applied for tenure were situated similarly to her.  Specifically, Kloss has not shown that the performance of any of the professors whom the Committee recommended for tenure was similar to her performance in terms of recruitment, student performance, scholarly publications, creative endeavors, and service.  The court therefore has no basis to believe that a comparison between BSU's treatment of Kloss and the other tenure applicants would be meaningful.

If Kloss had performed a statistical analysis showing a pattern of the School of Music denying tenure to Jewish or female candidates, she could have presented that as circumstantial evidence of discrimination under the direct method of proving intentional discrimination.   *Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.*, 254 F.3d 644, 651-652 (7th Cir. 2001); see *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000) (example of an employee who provided statistical analysis as direct proof of discrimination).  Here, Kloss has not performed any real statistical analysis; she has simply drawn conclusions from a minuscule sample size.  "A plaintiff who wants a court to infer discrimination from the employer's treatment of comparable cases has to analyze a goodly sample.  One is an anecdote, and several cases are several anecdotes.  Judges do

not find discrimination on such a thin basis." *Kuhn v. Ball State University*, 78 F.3d 330, 332 (7th Cir. 1996).


      B.     *Pretext*

    If the plaintiff meets her burden of establishing a *prima facie* case, a presumption of discrimination arises and the employer must articulate a legitimate non-discriminatory reason for its employment action. *Moser v. Indiana Dep't of Corrections*, 406 F.3d 895, 900 (7th Cir. 2005). Even if Kloss had established a *prima facie* case of discrimination based on sex and/or religion, BSU has responded that its decision to deny her tenure was based on performance inadequate to justify tenure.


    BSU has presented all of the written evaluations Kloss received in each of her five years, which indicate the committees' conclusions that Kloss' performance was deficient in the areas of recruitment, performances, and service. Def. Exs. F-I, K. In her third and fourth years, the School Committee provided Kloss with notice that she was not meeting the requirements for tenure and suggested ways in which she could improve her performance. BSU has also provided documentation of each step of the appeals process Kloss pursued, which further indicates that all decisions BSU made with regard to Kloss were based on her performance. Def. Exs. L, O-S.

Because the employer has asserted a legitimate, non-discriminatory reason for its decision, the burden then shifts back to the plaintiff to come forward with evidence that would allow a jury to find that the employer's explanation is a pretext for discrimination.  *Robin*, 200 F.3d at 1088.  At this stage of the analysis, it is irrelevant whether a jury might find only that Kloss' recruitment numbers, student achievements, performance engagements, and/or service activities *should* have been sufficient for the professors on the various committees to conclude that Kloss was making satisfactory progress toward tenure.  See *Hellan v. South Bend Community School Corp.*, 93 F.3d 327, 330 (7th Cir. 1996) ("the pretext inquiry focuses on whether the employer's stated reason was honest, not whether it was accurate.").  The University's appeal process is the proper forum in which Kloss may argue that the Committee made substantive errors in judgments about her professional qualifications.  Here, the relevant inquiry is whether the university used its tenure process as a smokescreen for discrimination based on sex and/or religion.  See *Vanasco v. National-Louis University*, 137 F.3d 962, 968 (7th Cir. 1998).

To survive summary judgment, Kloss must present evidence that would allow a reasonable jury to find that BSU did not honestly believe the reasons it gave for denying tenure.  See *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006).  She must show that BSU's assertion that Kloss had not met its tenure requirements was a mere pretext, meaning a lie or a "phony reason."  See *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995).  In university tenure

cases, the Seventh Circuit has cautioned that a grant of tenure requires "something more than mere qualification," so that disagreement about a candidate's qualifications and future academic promise is unlikely to support an inference of pretext.  See *Sun v. Board of Trustees of University of Illinois,* 473 F.3d 799, 815 (7th Cir. 2007); *Namenwirth v. Board of Regents of University of Wisconsin System*, 769 F.2d 1235, 1242 -1243 (7th Cir. 1985). "[T]enure decisions are often based on 'the distinction between competent and superior achievement.' Such decisions necessarily rely on subjective judgments about academic potential." *Vanasco*, 137 F.3d at 968 (7th Cir. 1998), quoting *Kuhn*, 78 F.3d at 331.   Assuming there is room for reasonable disagreement about Kloss' performance, the undisputed evidence would not support the further leap to a finding that BSU decision-makers did not honestly believe that her performance did not warrant an award of tenure.


Kloss has asserted that Professors Palmer and Tetel, who were her partners in the American Piano Trio, hatched a plot through which they convinced Dean Kvam and Professor McAllister to work with them to force Kloss out of her position.  Kloss Dep. at 141.  As evidence of the conspiracy, Kloss stated that she believed the faculty had failed her students even though they had performed well.  *Id.* at 144-45.  She further claimed that Palmer and Tetel canceled performances by the Trio to make her look bad.  *Id.* at 114.  Finally, she alleged that Professor Palmer encouraged students to write negative letters about her and to take them to chairman McAllister.  *Id.* at 99.

-18-

Kloss has not shown that Palmer and Tetel harbored ill-will toward her or hatched the alleged plot because of her gender or religion.  Kloss has alleged that Tetel made two comments about the presence of pork in the cafeteria.  *Id.* at 130-32.  These comments do not demonstrate animosity toward Kloss based on her religion, nor do they indicate that Tetel was engaged in a plot related to Kloss.  Kloss has stated that she believed Palmer was motivated to plot against her because "this woman was not a woman he could walk over."  Kloss Dep. at 116.  Kloss also stated that the alleged plot was the result of professional jealousy.  *Id.*  However, Kloss has not provided any evidence to support her belief that Palmer felt threatened by the strength and professional success of a woman or pursued a plot against Kloss based on these feelings.  A plaintiff's subject belief that she is the victim of unlawful discrimination does not raise a genuine issue of fact that requires a trial.

Even if Kloss had come forward with evidence that Palmer or Tetel harbored some animus against her because of her sex or religion, and she has not, such evidence would not defeat summary judgment because she has not linked them to the decision about her tenure.  Ordinarily, only the motivation of the individual or body that acted as the decision-maker is relevant for the purpose of a discrimination claim.  See *Hunt v. City of Markham*, 219 F.3d 649, 652 (7th Cir. 2000) ("the fact that someone who is not involved in the employment decision of which the plaintiff complains expressed discriminatory feelings is not evidence that the *decision* had a discriminatory motivation")  Neither Palmer nor Tetel

served on the School Committee, the College Committee, or the University Committee.  Kloss has stated that she does not believe that any of the members of the reviewing committees had any bias against her based on her sex or religion. Kloss Dep. at 50-51, 110-11, 113, 140-41, 146, 155.  Instead, Kloss asserts that Professors Palmer and Tetel influenced the members of the School Committee, the College Committee, the University Committee, and the Provost to recommend unsatisfactory progress toward tenure and ultimately to terminate her.  *Id.* at 141-42, 155.

The Seventh Circuit has held that the only situation in which the prejudices of a co-worker will be imputed to the decision-maker is "where the subordinate, by concealing relevant information from the decisionmaking employee or feeding false information to him, is able to influence the decision."  *Maarouf v. Walker Mfg. Co.*, 210 F.3d 750, 754 (7th Cir. 2000), quoting *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1400 (7th Cir. 1997).  To avoid summary judgment on the theory that Palmer and Tetel influenced the decisions of multiple committees, Kloss would need to present evidence that they concealed relevant information or fed false information to the committees.  Kloss has stated that she has no evidence that Palmer told any of the committee members to vote against her; she simply alleges that Palmer had access to Dean Kvam based on their personal friendship. Kloss Dep. at 113.  Thus, even if Kloss had offered evidence of religious or gender bias on the part of Palmer and/or Tetel, her evidence would not be enough to impute religious or sex discrimination to the School Committee or any of the

committees or individuals who affirmed the School Committee's decisions.  See *Murray v. Chicago Transit Authority*, 252 F.3d 880, 888 (7th Cir. 2001) (allegations that the close relationship between a co-worker and supervisor proved they had plotted together were "mere speculation" and insufficient to establish Title VII liability.)

Even if the court were to indulge the unsupported assumption that Palmer and Tetel harbored a bias against Kloss on grounds of sex or religion, and the further unsupported assumption that there was a conspiracy among Palmer, Tetel, and the music school administration to oust her, Kloss has not provided any evidence that connects this supposed conspiracy to the people on the committees who were the ultimate decision-makers about her progress toward tenure.  She has not provided enough evidence to convince a reasonable jury that BSU's proffered explanation that its recommendation to deny tenure was based on shortcomings in her performance was false.  BSU is entitled to summary judgment on these claims.

III.   *Hostile Work Environment*

A plaintiff can establish a violation of Title VII by proving that she was subjected to a hostile work environment, which the Supreme Court has defined as an environment in which harassment of the employee is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive

working environment." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67 (1986). The court must ask "whether the complaining person has been subjected to objectively offensive behavior, whether there is a link between that treatment and his or her protected characteristic, and whether the conditions are offensive from a subjective standpoint." *Bernier v. Morningstar, Inc.*, 495 F.3d 369, 373 (7th Cir. 2007). The court must look at the totality of circumstances to determine if there was a hostile work environment, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).

The record shows that anti-Jewish writing was found on a BSU building in 2001. Kloss Dep. at 40. Kloss also received an extremely hateful anti-Semitic letter sent anonymously through the mail, apparently posted from somewhere in Australia. See Pl. Ex. 8. The court recognizes the painful nature of these incidents. In addition, Kloss has offered evidence that several colleagues made statements regarding her religion that made her feel uncomfortable. Two colleagues made statements soon after meeting her that alluded to religion. Kloss Dep. at 35-37. Another colleague told two jokes about rabbis. *Id.* at 68, 134-35. A fourth colleague made two comments about pork. *Id.* at 130-132. The grand opening of the Sursa Music Concert Hall was held on Yom Kippur. *Id.* at 123. Kloss found all of these incidents insensitive and offensive.

Kloss must also show that these incidents were objectively offensive. The Seventh Circuit has instructed that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998), quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Two of the comments Kloss discussed simply mention religion and cannot objectively be described as offensive. A few tasteless or off-color jokes fall into the category of teasing. See *Hildebrandt v. Illinois Dep't of Natural Resources*, 347 F.3d 1014, 1034-35 (7th Cir. 2003) (no objectively hostile environment when off-color jokes were made in the presence of employee). From an objective standpoint, the jokes and comments Kloss complains of amount to several isolated statements over a period of five years. Together and individually, they do not rise above the level of teasing or approach the degree of severity required to constitute a hostile work environment.

Kloss also complains that Professor Palmer regularly put his arm around her and called her "beautiful," once touched her leg, and once tried to kiss her. Kloss Dep. at 46, 100. She perceived these actions as unwanted touching and unwelcome sexual advances. She must also show that these incidents were objectively offensive and hampered her ability to work.

Not all inappropriate workplace behavior is actionable under Title VII. *Smith v. Sheahan*, 189 F.3d 529, 532 (7th Cir. 1999). The Seventh Circuit has

recognized that there is no bright line between vulgar behavior and behavior that rises to the level of sexual harassment. *Worth v. Tyer*, 276 F.3d 249, 267 (7th Cir. 2001). Accordingly, the Court has provided useful guidance about how to assess the level of severity of allegations of physical contact:

> There are some forms of physical contact which, although unwelcome and uncomfortable for the person touched, are relatively minor. Cumulatively or in conjunction with other harassment, such acts might become sufficiently pervasive to support a hostile environment claim, but if few and far between they typically will not be severe enough to be actionable in and of themselves. A hand on the shoulder, a brief hug, or a peck on the cheek lie at this end of the spectrum. Even more intimate or more crude physical acts – a hand on the thigh, a kiss on the lips, a pinch of the buttocks – may be considered insufficiently abusive to be described as "severe" when they occur in isolation.

*Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000). In keeping with these general guidelines, the Seventh Circuit has consistently held that an individual who briefly makes physical contact with a non-intimate part of a co-worker's body does not create a hostile work environment. See, *e.g.*, *Adusumilli*, 164 F.3d at 361-62 (not actionable when a co-worker poked the buttocks of the employee); *DiCenso v. Cisneros*, 96 F.3d 1004, 1009 (7th Cir. 1996) (not actionable when official caressed woman's arm and back).

In contrast, in *Worth v. Tyer*, the Seventh Circuit held that a supervisor stroking an employee's body and placing his hand on her breast on a single occasion was objectively offensive and sufficiently severe to survive a motion for summary judgment. 276 F.3d at 268. In *Hostetler v. Quality Dining, Inc.*, the

Court held that a supervisor kissing an employee, unfastening her bra, and making comments about performing sex acts on her was sufficiently severe to survive a motion for summary judgment.  218 F.3d at 807-08.

Based on the standard laid out in *Hostetler*, the allegations that Palmer placed his arm around Kloss' waist and once touched her leg fall on the non-severe end of the spectrum.  The allegation that Palmer tried to kiss Kloss on one occasion describes an isolated incident that cannot be characterized as severe.  Though Palmer's (alleged) actions were inappropriate and might have violated BSU's Anti-Sexual Harassment Policy, see Def. Ex. D, they are not actionable under Title VII.

Kloss has also not presented evidence that Palmer's actions inhibited her ability to work in her capacity as a professor or as a member of the American Piano Trio.   Kloss described perceiving Palmer as her friend and seeking professional advice from him even as he continued to put his arm around her waist in the hallway.  Kloss Dep. at 67.  She also stated that she was "ready and willing" to perform with Palmer and the Trio at all times.  Kloss Aff. ¶ 22.  The undisputed facts show that Kloss' work environment was not a hostile work environment.

Even if Kloss could establish that there was a hostile work environment based on her sex and/or religion, she would have to present evidence that BSU

had notice or knowledge of the harassment to hold the university liable.  *Bernier*, 495 F.3d at 373-74.  When the alleged harasser is a co-worker, "the employer is liable only if it failed to have and enforce a reasonable policy for preventing harassment, or in short only if it was negligent in failing to protect the plaintiff from predatory coworkers."  *Doe v. Oberweis Dairy*, 456 F.3d 704, 716 (7th Cir. 2006), citing *Cerros v. Steel Technologies, Inc.*, 398 F.3d 944, 951-52 (7th Cir. 2005), and *Loughman v. Malnati Organization, Inc.*, 395 F.3d 404, 407 (7th Cir. 2005).

One factor in determining whether the employer had notice is whether the employer had designated procedures for reporting complaints of harassment.  See *Young v. Bayer Corp.*, 123 F.3d 672, 674 (7th Cir. 1997).  Here, BSU had adopted an Equal Opportunity Policy as well as Anti-Sexual Harassment and Anti-Harassment Policies.  Def. Exh. D.  It had also established an Office of University Compliance to receive complaints regarding unlawful discrimination.  *Id.*  The Anti-Sexual Harassment Policy states in part:

> The University can respond to specific instances and allegations of harassment only if it is aware of them.  The University therefore encourages anyone who believes that he or she has experienced sexual harassment to come promptly forward (typically within 45 calendar days) with inquiries, reports, or complaints and to seek assistance from the Office of University Compliance. . . .  It shall be the responsibility of the Office of University Compliance to respond to allegations and reports of sexual harassment or refer them to other University officials for an appropriate response.

Def. Ex. D at 2-3.  The Anti-Harassment Policy contains similar language.  *Id.* at 4.  Kloss stated that she received copies of all of these policies and was aware of the Office of University Compliance, though she claimed she thought it was "more for the student."  Kloss Dep. at 23.

The second factor in determining whether the employer had notice of a hostile work environment is whether the plaintiff provided enough information for a reasonable employer to think there was some probability that the plaintiff was being harassed.  *Zimmerman v. Cook County Sheriff's Dep't*, 96 F.3d 1017, 1019 (7th Cir. 1996).  Kloss stated that she never filed a complaint with the Office of University Compliance.  Kloss Dep. at 21, 24.  She argues that she complained about discrimination through her appeals of the School Committee's recommendation.[2]  The School of Music's Promotion and Tenure Document states that applicants for promotion or tenure can request reconsideration based on "allegation of discriminatory treatment *on the part of the decision makers*."  Def. Ex. E at 32 (emphasis added).  Though Kloss was entitled to use this procedure to complain about discrimination by members of the Promotion and Tenure

---

[2]Notes from the meetings at which Kloss sought reconsideration of the School Committee's tenure decision reflect that Kloss complained only about the scheduling of the Concert Hall dedication on Yom Kippur and what she perceived as anti-Semitic remarks, and made no allegations of sexual harassment.  See Def. Exs. O & Q.

Committee,[3] it was not the appropriate method through which to complain about harassment by non-Committee members that had occurred years earlier.[4]

Kloss has not presented evidence of religious or sexual harassment that created an objectively hostile work environment.  She has also not presented evidence that she had notified BSU of any incidents of alleged religious or sex discrimination by her colleagues.  BSU cannot be held liable under a hostile work environment theory.

*Conclusion*

The plaintiff's claims of age discrimination are barred by the Eleventh Amendment.  The plaintiff has not presented a *prima facie* case of religious and/or

---

[3]Kloss based her request for reconsideration in part on allegations of discriminatory treatment. Each of the committees ultimately concluded that there was no evidence of discriminatory treatment in the tenure review process.  Def. Exs. L-S.  Because of Kloss' allegations of discriminatory treatment, Sali Falling, the director of the Office of University Compliance, sat in on each of the meetings that included discussions of Kloss' tenure status.

[4]The Seventh Circuit recently reversed a decision on a hostile environment claim in which the district court had granted summary judgment for an employer in part because the employee had failed to utilize company procedures when lodging her internal complaint of sexual harassment.  In *Equal Employment Opportunity Commission v. V&J Foods, Inc.*, the Court held it was sufficient that the employee had brought her complaint to the attention of her employer, even though she had not used the procedures the employer had adopted, because the employer's procedures were confusing and unreasonable.  No. 07-1009, 2007 WL 3274363, at *2-3 (7th Cir. Nov. 7, 2007).  Here, the procedures BSU had adopted for reporting harassment by a colleague were neither confusing nor unreasonable. Kloss should have used those procedures to complain about perceived religious or sexual harassment by non-Committee members.

sex discrimination under Title VII, nor has she presented sufficient evidence to rebut the defendant's legitimate non-discriminatory reason for her denial of tenure.  She has also not presented evidence to show that she was subjected to a hostile work environment or that BSU would be legally responsible for any alleged hostile environment.  The court grants the defendant's motion for summary judgment on all claims and will enter final judgment for defendant.

So ordered.

Date: November 19, 2007

DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Daniel Robert Carroll
CARROL LAW FIRM
dancarroll51@yahoo.com,jodkalawoffice@kconline.com

Shawn A. Neal
DE FUR, VORAN, HANLEY, RADCLIFF & REED, LLP
sneal@defur.com

Scott E. Shockley
DE FUR, VORAN, HANLEY, RADCLIFF & REED, LLP
sshockley@defur.com